[657 NYS2d 686]

Laszlo N. Tauber, Respondent-Appellant, v Bankers Trust Company, Appellant-Respondent.

First Department, May 29, 1997

## APPEARANCES OF COUNSEL

*Joel M. Leifer,* New York City, for respondent-appellant.

*David M. Satnick* of counsel, New York City *(David B. Eizenman* and *Roni Schneider* on the brief; *Loeb & Loeb, L. L. P.,* attorneys), for appellant-respondent.

## OPINION OF THE COURT

SULLIVAN, J. P.

On this appeal from the denial of summary judgment in favor of defendant Bankers Trust Company and cross appeal from the dismissal of the second and third causes of action of the amended complaint alleging breach of fiduciary duty and negligence, respectively, the issue is whether material issues of fact exist as to plaintiff's claim that the bank improperly refused to close out certain foreign currency swap transactions between the parties.

Plaintiff, a sophisticated currency trader with Bankers Trust and other institutions, entered into an Interest Rate and Currency Facility Agreement, dated April 2, 1987, with Bankers Trust setting forth the general terms of their agreement with respect to foreign currency swaps. Each transaction, however, was to be governed and evidenced by a separate written or telexed confirmation concerning the terms of the particular transaction. Although currency swaps have a maturity date, that is, the date on which the transaction would have to close, plaintiff and the bank regularly terminated swap transactions

before the maturity date by creating offsetting or mirror image positions.

After several disputes had arisen between them, plaintiff and the bank, on May 8, 1989, entered into a written settlement agreement, which provided for the closing or transfer of most of their existing swap transactions, and effectively severed their relationship, except for their entry into two new foreign currency swaps sought by plaintiff as part of the settlement. These swaps are the subject of this lawsuit.

Under the first of these swaps (swap No. 1), the bank agreed to pay plaintiff on the maturity date, December 28, 1994, the principal amount of 35,000,000 Australian dollars (AUD) and to make quarterly payments of accrued interest thereon; plaintiff agreed to pay to the bank on the maturity date the principal amount of 41,237,000 Swiss francs (SFR) and to make quarterly payments of interest thereon. Swap No. 1 further obligated plaintiff to make additional quarterly payments to the bank of 125,000 SFR, sometimes referred to as the Swiss Franc Annuity, to the date of maturity.

Under the second of the swaps (swap No. 2), the bank agreed to pay to plaintiff on the maturity date, December 28, 1994, the principal amount of 15,000,000 AUD and to make quarterly interest payments thereon; plaintiff agreed to pay to the bank on the maturity date the principal amount of 17,673,000 SFR and to make quarterly interest payments thereon. Plaintiff's obligations under the subject swaps were secured by a deposit of Swiss francs with the bank's Zurich affiliate, Bankers Trust, AG. (BTAG).

The subject swaps could not be closed out, in whole or part, prior to their December 28, 1994 maturity date without the agreement of both parties. Each transaction was expressly subject to the terms of the Interest Rate and Currency Facility Agreement, which contained a clause rendering ineffective any amendment, modification or waiver of the agreement except by writing signed by the parties or an exchange of telexes.

In the spring of 1991, plaintiff advised the bank that he wished to close out the subject swaps partially. The bank was unwilling to do so but, as indicated in an April 29, 1991 letter from a managing director and counsel, Burton M. Freeman, to plaintiff's counsel, Roger T. Scully, offered plaintiff the option of closing out the swaps in their entirety. Plaintiff's response, by letter of July 11, 1991 from Scully to Freeman, was to propose again a partial closeout. Since the cross-currency rate between Swiss francs and Australian dollars at the time

favored plaintiff, a partial closeout would have entailed an immediate cash payment to plaintiff without any disposition of plaintiff's obligation to pay the Swiss Franc Annuity. Accordingly, the bank, by letter dated July 30, 1991, rejected plaintiff's partial closeout proposal and instead offered plaintiff the option "to fully reverse the two [subject] swaps and to require prepayment of the Swiss Franc Annuity on a discounted basis." The bank's July 30, 1991 letter also illustrated the cost to plaintiff if he accepted and were to exercise the option. For instance, based on July 24, 1991 figures, plaintiff would have to make a $922,791 net payment to the bank since he would be required to pay $1,017,137 to the bank "to anticipate the Swiss Franc Annuity."

On August 21, 1991, plaintiff called Freeman to accept the bank's July 30, 1991 counterproposal with one condition: "that [plaintiff could] pick the date of termination." By letter of August 22, 1991, the bank accepted plaintiff's condition and, at plaintiff's request, designated Christoph Schmidt as its representative to whom plaintiff could give his closeout instructions. In that same letter the bank stressed that "we expect [plaintiff] to specify a date of his choosing and instruct Mr. Schmidt to execute *all* of the transactions outlined in that [July 30, 1991] letter and to pay whatever sums those transactions called for in immediately available funds" (emphasis in original). According to the amended complaint, the terms and conditions set forth in the bank's July 30 and August 22, 1991 letters comprise the agreement that the bank allegedly breached.

On April 16, 1992, Scully faxed a letter to Freeman confirming that the bank had "previously agreed to permit my Client to close out the [subject swaps] in [their] entirety" and requesting the bank to "calculate the cost of closing said position by entering into a reverse transaction at this time". Approximately one-half hour later, Scully faxed another letter to Freeman advising him that plaintiff had decided against closing out the subject swaps; instead, Scully stated, "AIG [Trading Corp.] has agreed to substitute for [plaintiff] in the [swaps]". Following receipt of the second Scully letter of April 16, 1992, Freeman had a number of telephone conversations with Scully relative to plaintiff's proposed assignment of the subject swaps to AIG, including an April 21, 1992 conference call with plaintiff and Scully. At that time, plaintiff and Scully advised Freeman that plaintiff's proposed assignment of the subject swaps to AIG was no longer an option because AIG required plaintiff to post collateral, which he did not have. Plaintiff and Scully

asked Freeman to ascertain the closeout price for the subject swaps and provide that information to Scully.

On the morning of April 24, 1992, Freeman telephoned Scully to advise him that a closeout would require a payment to the bank of $929,000. Unable to reach plaintiff, Scully, at 4:30 P.M., faxed a letter to Freeman apologizing for his inability to "make the link up with [plaintiff] today", thanked Freeman for his "patience in this matter" and acknowledged that "this is an accommodation on your part." Scully's April 24 letter noted, "Apparently the market has moved against [plaintiff] since we last spoke. For this reason, [plaintiff] is unwillingly [sic] to close at this time. However, he wants to be sure that he can move quickly in the future if the market becomes more favorable." Scully stated that plaintiff had "requested that [Scully] obtain the telephone number of the appropriate Bankers Trust representative he will be dealing with, or otherwise advise him of the procedure to be followed to arrange the closeout of the remaining position."

Freeman responded for the bank by letter of April 30, 1992. Since Mr. Schmidt, the bank's original designee to receive any closeout instruction from plaintiff, would shortly be leaving the bank, he advised Scully that Peter Udale of its London office was now nominated for that purpose. Freeman cautioned that "it would be wise for the conversation between [plaintiff] and Mr. Udale to be conducted with counsel on the telephone" and suggested that when plaintiff believed the market to be favorable to him Scully should contact Freeman, who would "promptly arrange a conference [call] among the four of us." Freeman named another bank lawyer to call in his stead should he be unavailable for such a call.

On May 5, 1992, Freeman learned that plaintiff had contacted the bank's Zurich office, where he had an account, and had indicated, rather ambiguously, that he wished either to "hedge" or close out the subject swaps. In order to ascertain plaintiff's intentions, Freeman immediately faxed a letter to Scully reiterating what he had said in his April 30, 1992 letter. Receiving no response, Freeman wrote again to Scully on June 5, 1992, informing him that he had been advised that "the market is moving in [plaintiff's] favor" and suggesting that plaintiff might "want to review his position and decide on doing the transaction that we have been talking about all these many weeks." Freeman received no response to this letter either.

The only communications between plaintiff and the bank after Freeman's June 5, 1992 letter were an August 27, 1992 let-

ter demand by the bank, written to Scully, that plaintiff provide additional collateral to secure his liability to the bank under the subject swaps pursuant to the parties' collateral maintenance agreement and Scully's subsequent September 3, 1992 proposal on behalf of plaintiff to pledge real estate to meet his collateral deficit. Despite Freeman's efforts, no such pledge was forthcoming. By December 1993, Scully was no longer representing plaintiff. A subsequent letter of December 23, 1993 from Freeman to plaintiff concerning the proposed pledge of real estate went unanswered.

On May 10, 1994, plaintiff sued the bank, making it obvious that he had no intention of honoring his contractual commitment to the bank upon the subject swaps' December 28, 1994 maturity. After crediting plaintiff with the payments due him under the swaps, as well as the value of the foreign currency pledged to secure his obligations thereunder, the bank calculated that plaintiff owed it $3,853,721.72, no part of which has been paid. The bank seeks to recover this sum in a counterclaim as well as its costs and expenses, including legal fees, in enforcing plaintiff's obligations, as provided for in the Facility Agreement.

In his original complaint, plaintiff alleged that on April 24, 1992 the bank breached the agreement permitting him to close out the subject swaps in their entirety on a date of his choosing by "absolutely refus[ing] to deal with" him when he sought such a closeout. Plaintiff also asserted claims grounded in breach of fiduciary duty, breach of "duty of good faith" and negligence. The bank's motion to dismiss the complaint pursuant to CPLR 3211 (a) (1) on the ground of documentary evidence as to the breach of contract claim and for legal insufficiency (CPLR 3211 [a] [7]) as to the other claims was denied as to the contract claim but granted as to the other claims, with leave to plaintiff to serve an amended complaint as to the breach of fiduciary duty and negligence claims. The bank had argued that the breach of contract claim was barred by documentary evidence, including Scully's April 24, 1992 letter in which he informed the bank that plaintiff was unwilling to close out the subject swaps.

Plaintiff thereafter served an amended complaint alleging again a breach by the bank of his August 21, 1991 acceptance of the bank's July 30, 1991 proposal affording him the option of terminating the swaps in their entirety prior to the maturity date. Specifically, plaintiff alleged that, in mid-April 1992, he "called Bankers' trading desk to place an order to close the

Subject Swaps" but that "Bankers personnel who handled [plaintiff's] several calls for this purpose refused to deal with him." Plaintiff further alleged that he "continued his efforts * * * during April 21-22", making his "last attempt" to close out the subject swaps on the morning of April 24, 1992, but "Bankers' trading desk again refused to deal with [him]." Plaintiff now takes the position that these allegations were pleaded in error; as he admits, he never contacted the trading desk. And, as was established by the deposition testimony of plaintiff and Scully, plaintiff never sought to close out the subject swaps in their entirety.

After the depositions of plaintiff, Scully and Freeman had been taken and other discovery completed, the bank moved for summary judgment dismissing the amended complaint and for an award on its counterclaims, arguing that the undisputable evidence established that, contrary to the pleaded allegations that the bank refused to deal with plaintiff on the proposed closeout, plaintiff never instructed the bank to close out the swaps in their entirety. The IAS Court granted the motion to the extent of dismissing the breach of fiduciary duty and negligence claims but denied the motion insofar as the bank sought dismissal of the breach of contract claim and summary judgment on its counterclaims, concluding that "the issue still remains whether * * * [plaintiff] actually issued a proper transfer demand or advised his attorney to issue one on or about April 24, 1992." As this record undisputedly reflects, there is no such issue and the bank's summary judgment motion should have been granted in all respects.

In his amended complaint, plaintiff alleges that in April 1992 the bank breached the parties' agreement, set forth in the bank's July 30, 1991 letter proposal, accepted by plaintiff on August 21, 1991 and confirmed by the bank's letter of August 22, 1991, by failing or refusing to allow him to close out the subject swaps prior to their December 28, 1994 maturity. That agreement, affording plaintiff the option to close out the swaps prior to the maturity date, required a full reversal of all aspects of the swaps. If plaintiff were to exercise the option, he had to prepay, under swap No. 1, to the bank, on a discounted basis, the Swiss Franc Annuity, namely, SFR 125,000 quarterly until December 28, 1994. The undisputable evidence, however, including the admissions of plaintiff and his lawyer, Scully, shows that plaintiff never sought to exercise the option because he was unwilling to prepay the Swiss Franc Annuity obligation. In fact, plaintiff concedes that he had no intention of prepaying that annuity.

The law is clear that when a person accepts an option he or she is required to perform in accordance with the terms of the option agreement. (22 NY Jur 2d, Contracts, § 318 [1996].) "[T]he general principles governing option agreements * * * require that their provisions be complied with strictly in the manner and within the time specified." (*Bresnan v Bresnan*, 156 AD2d 532; *see, D. A. D. Rest. v Anthony Operating Corp.*, 139 AD2d 485, 486, *lv denied* 72 NY2d 806.) On this record, it is manifestly clear that plaintiff never sought to close out the subject swaps in their entirety, as the parties' agreement in writing expressly required.

In his deposition, Scully testified that plaintiff never authorized him to close out the swaps in their entirety either on or before April 24, 1992 or at any time thereafter. In fact, plaintiff, on April 24, 1992, communicated to Scully that he was unwilling to close out. Nor, according to Scully, at any time through April 24, 1992 did plaintiff ever advise him that he had instructed the bank to close out the swaps in accordance with its July 30, 1991 letter. Rather, as plaintiff concedes, he sought only to "hedge" his position by a partial closeout through the creation of a new "mirror image" swap. As plaintiff argues, his proposal for a new "mirror image" swap "in conjunction with the use of the collateral deposited with BTAG in order to secure the payment of the Swiss Franc Annuity would have effectively closed out the [s]ubject [s]waps." This argument, of course, ignores the fact that the bank steadfastly rejected plaintiff's proposals for a partial closeout. The reason is clear. A partial closeout would not fully close out the subject swaps but would have left open and unpaid plaintiff's Swiss Franc Annuity obligation under swap No. 1. There is no merit to plaintiff's contention that the terms and conditions reflected by the July 30, 1991 and August 22, 1991 letters did not require him to prepay the Swiss Franc Annuity; as noted, such payment was an integral condition to any early closeout of the subject swaps.

Equally specious is plaintiff's argument that his efforts to close out the swaps "were totally frustrated by the [b]ank's refusal to speak to [plaintiff] directly." The bank's August 22, 1991 letter specifically designated Mr. Schmidt as its representative to whom plaintiff could communicate his closeout instructions. As conceded, plaintiff never contacted Schmidt to close out the subject swaps in accordance with the agreement.

Plaintiff's argument that the bank should have acceded to his request for an early closeout of only a part of the subject

swaps, without the prepayment of the Swiss Franc Annuity under swap No. 1, is unavailing. That argument, premised on the notion that since the bank held foreign currency as collateral there was no risk as to plaintiff's continuing obligation to pay the Swiss Franc Annuity, is meritless. Absent modification of the agreement, by which plaintiff had the option to close out the subject swaps but only in their entirety, neither plaintiff nor the bank could require the other to close out any part of the swaps prior to their December 28, 1994 maturity. As this record clearly shows, the bank consistently rejected plaintiff's entreaties for a partial closeout and stated, unambiguously, in both its July 30 and August 22, 1991 letters, that plaintiff could elect to close out the subject swaps but only in their entirety. The bank had no obligation to accede to plaintiff's partial closeout proposal or to accept the credit risk of his proposal. It should be noted that, at the time plaintiff was seeking a partial closeout, he had suffered serious financial reversals as a result of his 2,702 foreign currency swap transactions with Salomon Brothers, culminating in a judgment against him in excess of $30 million, which had not been satisfied.

■ If, on the other hand, plaintiff rejected the bank's July 30, 1991 proposal, as he testified at his deposition, then there was no agreement to breach since the record is clear that the bank's agreement to allow an early closeout was limited to a closeout in full. Inasmuch as plaintiff never exercised the option to close out the subject swaps in their entirety prior to their December 28, 1994 maturity, he is obligated to pay the net amount due upon the swaps' maturity, $3,853,721.72, the detailed computation of which plaintiff does not dispute. Thus, the bank is entitled to summary judgment on its counterclaims.

As for the argument that plaintiff has been foreclosed from taking depositions, as the record makes clear, the facts necessary to oppose the bank's summary judgment motion are within plaintiff's personal knowledge. Given plaintiff's concession that he never sought to close out the swaps in their entirety, he is unable to explain how any of the testimony or documents sought could have any bearing on that issue. No additional discovery can alter the uncontroverted fact that plaintiff never sought to close out the swaps in their entirety by, among other things, prepaying the Swiss Franc Annuity, which was the only option afforded him under the agreement.

■ Finally, plaintiff's breach of fiduciary duty and negligence claims were properly dismissed. Although plaintiff pleads that the bank acted as his "broker and/or dealer, and advisor * * *

in particular with respect to the [s]ubject [s]waps", he conceded in his deposition that the bank did not, with respect to the subject swaps, act as his broker, dealer or advisor and that he did not rely on anything the bank said or did with respect to these transactions. His decision to enter into the subject swaps was based entirely upon his independent speculation and business judgment. In no sense of the word was the bank plaintiff's fiduciary. As already noted, plaintiff's claim that the bank negligently failed "to give [him] direct access to the persons who could close out the swaps in a timely manner" is demonstrably false.

Accordingly, the order of the Supreme Court, New York County (Walter Schackman, J.), entered on or about June 14, 1996, which, to the extent appealed from, denied defendant's motion for summary judgment dismissing the first cause of action of the amended complaint and on its counterclaims but granted summary judgment dismissing the second and third causes of action of the amended complaint, should be modified, on the law, to the extent that summary judgment be granted dismissing the first cause of action and awarding defendant judgment on its counterclaims and, except as thus modified, affirmed, without costs or disbursements.

ELLERIN, RUBIN and MAZZARELLI, JJ., concur.

Order, Supreme Court, New York County, entered on or about June 14, 1996, modified, on the law, to the extent that summary judgment be granted to defendant dismissing the first cause of action and awarding defendant judgment on its counterclaims and, except as thus modified, affirmed, without costs or disbursements.